Chables Margett, J.
This trial raises a question fundamental to the law of mortgages. That question is: Did the mortgagee, prior to executing the mortgage under the circumstances of this case, have the duty to investigate the credit structure of the mortgagor’s tenant in order to ascertain that the tenant’s bondholders would not be prejudiced by the mortgage?
This action to foreclose certain consolidated mortgages on real property and chattels executed by Howard Park Corporation (hereinafter ‘ Howard Park” or “mortgagor”) on certain property owned by it located at 155-55 Cross Bay Boulevard, Queens, and known as the Howard Park Hospital was tried by the court without a jury. Plaintiffs mortgagees are the trustees of a Teamsters’ Union area pension fund (hereinafter “ the Fund ” or “mortgagee”). The answering and appearing defendants (hereinafter “ bondholders ”) are debenture holders of Howard Park’s tenant of the subject real property, First Americana Corporation (hereinafter “ First Americana ”). The bondholders’ answer is a general denial and a counterclaim which alleges that a certain lease modification and assignment to the Fund by First Americana was a fraudulent conveyance entitling the bondholders to a lien superior to that of plaintiffs against the premises to the extent of their unpaid bonds. The bondholders are the only defendants who have appeared and answered and there is no question but that the mortgagor is in default.
On June 2, 1960, Howard Park executed a note and mortgage on the subject real property in the sum of $1,500,000 to the County Federal Savings & Loan Association which soon thereafter recorded that mortgage. Thereafter, on January 8, 1963, the mortgagee bank assigned that mortgage for consideration of $1,427,873.66 to the plaintiffs, and, concurrently with this transaction, Howard Park executed another note and mortgage jn the sum of $1,572,126.34 to the Fund, and the two mortgages at the same time were consolidated and extended into a single $3,000,000 lien which was recorded on January 11, 1963. On March 18, 1963, an additional note and mortgage in the sum of $300,000 was executed by Howard Park to the plaintiffs and consolidated with the prior two mortgages, thereby constituting a $3,300,000 lien on the premises which was recorded on March 21,1963. The total proceeds of the mortgages made by Howard Park to plaintiffs were paid solely to or for the benefit of Howard Park and *836 no part of the proceeds were paid to First Americana. Howard Park also on January 10, 1963 and March 18, 1963 executed chattel mortgages on “ all of the personal property situate in the building ”.
A leu.se between Howard Park Corporation and a lessee of the subject real property, executed on May 1, 1959, was assigned to First Americana by the original tenant on February 2, 1961. Pursuant to the terms of that lease, First Americana erected and equipped on the subject premises a 233-bed hospital building. Paragraph twenty-first of the lease provided in part: ‘ ‘ Providing that the Lessee shall not be in default hereunder and in the event the Lessee erects a building such as is hereinafter permitted, the Lessor does hereby agree on, before or after completion of said building or buildings, to subordinate its fee interest in the premises leased, and this lease, to the execution of a building loan and mortgage to be obtained by the Lessee, and at the Lessee’s sole expense, from a lending institution in such amount as the lending institution will lend, and which mortgage shall be fully amortized and paid prior to the expiration of the original term of this lease. Lessee shall have the right to extend, renew or modify such mortgage or place a new mortgage providing that by terms of such instrument said mortgage shall be amortized and fully paid within one year before expiration or option term or terms, and further provided Lessee has exercised such option or options to extend, and further provided that any such extension, renewal, modification or new mortgage shall conform with the requirements of this paragraph, as to amount and lending institution.” (Emphasis supplied.)
Paragraph thirty-seventh of the lease provided:
‘ Lessor shall have the right to place mortgage or mortgages upon the demised premises to the extent of any amount it sees fit, providing that:
“ (a) Such mortgage or mortgages shall be subject and subordinate to mortgage set forth in Paragraph Twenty-first herein.
“ (b) That such mortgage or mortgages shall be subject and subordinate to the within lease.
“ Lessor agrees to execute, if necessary, any such subordination agreements at its own expense.” (Emphasis supplied.)
On May 10, 1962, First Americana sublet the premises to Howard Park General Hospital Associates, a copartnership, at an annual rental of $450,000. Thereafter in September, 1962, Howard Park, First Americana and Howard Park General filed a joint application with the plaintiff for a mortgage loan in the *837 sum of $3,500,000. On November 9,1962 Howard Park and First Americana entered into an ‘ ‘ Agreement for Modification and Extension of Lease ’ ’, which amended the lease of May 1, 1959 to provide, inter alia, that “ for One Dollar ($1.00) and other valuable consideration by each of the parties hereto to the other in hand paid ’ ’
" the lessor reserves the right to subject and subordinate this Lease at all times to the lien of any mortgage or mortgages now or hereafter placed upon the lessor's interest in the said premises and on the land and building of which the said premises are a part, or upon any buildings hereafter placed upon the land of which the leased premises form a part.
" and the lessee covenants and agrees to execute and deliver upon demand, such further instrument or instruments subordinating this Lease to the lien of any such mortgage or mortgages as shall be desired by the lessor and/or any mortgagees or proposed mortgagees and hereby irrevocably appoints the lessor the attorney-in-fact for the lessee to execute and deliver any such instrument or instruments for and in the name of the lessee.
“ The lessee does hereby acknowledge privity between itself and the holder of any mortgage or mortgages now or hereafter placed on the lessor's interest in the said premises and on the land and building of which the said premises are a part, or upon any buildings hereafter placed upon the land upon which the leased premises form a part and to which this Lease is subordinate, and in the event of a foreclosure of any such mortgage or mortgages, as aforesaid, then this Lease, without the execution of any further documents shall be deemed to have been assigned by the lessor to any such purchaser or purchasers at the foreclosure sale.” (Emphasis supplied.)
On January 10, 1963, First Americana assigned its sublease of May 10, 1962 with Howard Park General to the Fund and also on that date assigned to the Fund its rents from the premises. On that date, Howard Park also assigned to the Fund “ all the rent, rentals or sums of money due or to become due for the use and occupancy of the premises” and by a separate document assigned to the Fund its lease of May 1, 1959 with Howard Park General. These assignments were made as collateral security for the performance of the consolidated mortgage simultaneously executed by Howard Park and provided that they would “ only become effective upon default by the Howard Park Corporation herein under the terms of the consolidated mortgage.”
*838 The defendants are holders of First Americana 10% Series “A” 10-Year Convertible Subordinate Debentures on which the unpaid principal amounts to $145,300. That corporation was organized on January 18, 1961. The prospectus issued by First Americana along with the offering of the debentures stated that the exterior of the hospital had been at that date completed and that the hospital would be completed by late Spring of 1961 and that after the sale of' the debentures the total mortgage indebtedness against the hospital property would not exceed $1,500,000, and the bonds themselves stated that they were “ general obligations of the Corporation [First Americana] and subordinate to all obligations now or hereafter owing by the Corporation ”.
The bondholders contend that they are entitled to a lien prior to that of the mortgagee (1) because the mortgagee was not a bona fide purchaser of the mortgage since at the time it executed the mortgage and received the conditional assignments it had knowledge, or was charged by law with knowledge, in light of the co-existing execution of the allegedly fraudulent modification and assignment of the lease by First Americana, that the mortgage would act to the detriment of the bondholders and (2) the mortgagee has participated in a scheme with Howard Park to cut off any equity existing in First Americana.
In support of its contention that the Fund should have known of the existence of the bondholders and of the fraud perpetrated on them, defendants adduced proof at the trial of the circumstances surrounding the granting of the mortgages by the Fund in January, 1963. It was established that in September, 1962 a joint application for a mortgage loan in the sum of $3,500,000 was addressed to plaintiff in the names of Howard Park, First Americana and Howard Park G-eneral and that the Fund’s board of trustees at its September, 1962 meeting approved the application “ subject to the criteria and legal requirements of the fund and availability of moneys and personal guarantees of the people ”. The board thereafter referred the application to its real estate appraisal consulting firm which conducted an appraisal of the subject real property and which also recommended that any mortgage commitment be issued to both Howard Park and First Americana. It was also established that the mortgage application was approved on the basis of the appraisal and on the basis of the submitted copy of the Hospital’s operating budget and that the Fund did not require a copy of the financial statements of the applicants. In support of its argument that the Fund was put on inquiry as to the existence of the rights of the bondholders, *839 defendants’ brief alludes to the following: (a) the original lease provided that the hospital was to be erected by the tenant; (b) the lease did not contain a subordination clause but, to the contrary, precluded the landlord from making any mortgage except one which was subject to the lease; (c) the landlord made a $1,500,000 mortgage in 1960; (d) that the recommendation of plaintiffs’ appraiser of November 8, 1962 was to the effect that the tenant should be included as a mortgagor; (e) that the purported modification agreement of November 9, 1962, being signed by Herbert T. Brown on behalf of both parties and presumably being executed to attempt to obviate the problems set forth in the appraisal letter of November 8, 1962, was so made without any authority whatsoever; and (f) that the net income to the mortgagor was only $54,000 per annum, whereas the mortgage payments required under the mortgage totaled the sum of $295,246.92.
The Fund contends that the very existence of the bondholders was unknown to it until shortly before the commencement of this action and that it was under no duty to ascertain the existence of these creditors of the mortgagor’s tenant.
At the outset, this court finds that (1) there is no evidence in the record that the mortgagee has participated in a scheme with Howard Park to cut off rights of the bondholders; (2) even though the Fund knew of the execution of the modification of the lease and initiated the execution of that document, it had no actual knowledge of the existence of the bondholders and that the mortgage would work to their detriment. The question is, therefore, assuming the lease modification was a fraudulent conveyance, is the Fund by law charged with knowledge that the mortgage would have such an effect.
The bondholders seek, pursuant to section 278 of the Debtor and Creditor Law, to set aside the modification of the lease executed by First Americana to Howard Park. That section provides:
“ § 278. Rights of creditors whose claims have matured. 1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser.
“ a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or
‘ ‘ b. Disregard the conveyance and attach or levy execution upon the property conveyed.
*840 “ 2. A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment.”
That section means that if the Fund, as a transferee of the mortgage, was a purchaser for valuable consideration without knowledge, actual or constructive, of the transferor’s fraud, i.e., a bona fide purchaser, the Fund is entitled to protection of its title against the creditors of the transferor.
The doctrine of constructive notice was best defined in the case of Williamson v. Brown (15 N. Y. 354) which is the landmark decision in this area. There the court defined constructive notice in a manner which has been often quoted not only by the courts of this State, but also by the courts of sister states. The court stated (p. 362): “If these authorities are to be relied upon, and I see no reason to doubt their correctness, the true doctrine on this subject is, that where a purchaser has knowledge of any fact, sufficient to put him on inquiry as to the existence of some right or title in conflict with that he is about to purchase, he is presumed either to have made the inquiry, and ascertained the extent of such prior right, or to have been guilty of a degree of negligence equally fatal to his claim, to be considered as a tona fide purchaser. This presumption, however, is a mere inference of fact, and may be repelled by proof that the purchaser failed to discover the prior right, notwithstanding the exercise of proper diligence on his part.” Therefore, “ To charge a party with notice, the circumstances known by him must be such as ought reasonably to have excited his suspicion, and to have lead him to inquire.” (Baker v. Bliss, 39 N. Y. 70, 74.)
In later eases, the Court of Appeals has reaffirmed the definition of constructive notice laid down in Williamson (supra). For example, in Fidelity & Deposit Co. v. Queens County Trust Co. (226 N. Y. 225, 233), the court stated: “ One who has reasonable grounds for suspecting or inquiring ought to suspect, ought to inquire, and the law charges him with the knowledge which the proper inquiry would disclose. Actual notice may be proved by direct evidence or it may be inferred or implied. Actual knowledge is not required. Actual notice embraces all degrees and grades of evidence, from the most direct and positive proof to the slightest circumstance from which a jury would have been warranted in inferring notice. If a person has knowledge of such facts as would lead a fair and prudent man, using ordinary thoughtfulness and care, to make further accessible inquiries, and he avoids the inquiry, *841 he is chargeable with the knowledge which by ordinary diligence he would have acquired. Knowledge of facts, which, to the mind of a man of ordinary prudence, beget inquiry, is actual notice, or, in other words, is the knowledge which a reasonable investigation would have revealed. (First National Bank of Paterson v. National Broadway Bank, 156 N. Y. 459; Baker v. Bliss, 39 N. Y. 70; Williamson v. Brown, 15 N. Y. 354; Anderson v. Blood, 152 N. Y. 285; Peck v. Bank of America, 16 R I. 710.) ”
The question now to be considered is whether the broad language cited in the cases above is applicable to the facts presented herein.
The doctrine of constructive notice, as applied in real property cases, is generally applied in three areas. It has been used to charge purchasers of real property with notice of other recorded documents affecting their property even where the purchaser was unaware of these documents. (See Bentley v. Gardner, 45 App. Div. 216.) It has also been applied to charge a purchaser with knowledge where a third person is in possession of the land under a previous unrecorded title at the time the purchaser took title to the land. (Schenectady Sav. Bank v. Werthein, 237 App. Div. 311.) And it has most often been applied in cases involving foreclosure of mortgages executed after unrecorded mortgages or contracts of sale had been made by the mortgagor with other persons. (See Ardisko, Ltd. v. Laconic Holding Corp., 10 A D 2d 973; Cassia Corp. v. North Hills Holding Corp., 278 App. Div. 960; see, also, Builders Equity v. Larkport Bldg. Corp., 17 Misc 2d 967.)
The applicability of the doctrine to actions involving real property was discussed in Parker v. Conner (93 N. Y. 118). That case involved the question of whether the doctrine should be applied to purchasers of chattels, but the court, in discussing the applicability of the doctrine to real property transfers, stated (p. 124) “ The doctrine of constructive notice has been most generally applied to the examination of titles to real estate. It is the duty of a purchaser of real estate to investigate the title of his vendor, and to take notice of any adverse rights or equities of third persons which he has the means of discovering and as to which he is put on inquiry. If he makes all the inquiry which due diligence requires, and still fails to discover the outstanding right, he is excused; but if he fails to use due diligence, he is chargeable, as matter of law, with notice of the facts which the inquiry would have disclosed. (Williamson v. Brown, 15 N. Y. 354, and cases cited; Acer v. Westcott, 46 id. 384; 7 Am. Rep. 355.) ”
*842 The court continued (pp. 124-125): “but the notice, in all such cases to be found in the books, relates to some actual outstanding title, lien, or equitable interest. Such outstanding rights of third parties, though prior in point of time to the title acquired by a purchaser, are often cut off by the operation of the recording acts, and the doctrine of constructive notice has been most frequently applied to that class of cases so as to deprive the purchaser of the protection which those acts afford to purchasers in good faith and without notice.
“ We have not been referred to any case where the doctrine of constructive notice has been applied so as to charge a purchaser of land, who has paid a valuable consideration and was, in fact, innocent of any guilty knowledge, with notice that his grantor made the conveyance with intent to defraud creditors at large, having no special lien or equity.” (Emphasis supplied.)
The court held that in that case it would not extend the rule of constructive notice which ‘ ‘ it has been frequently said in adjudged cases that the doctrine should not be extended” (p. 124) to cases involving purchasers of chattels and that in that case “ actual good faith should be sufficient to protect the purchaser” (p. 128).
The case of Anderson v. Blood (152 N. Y. 285) also involved the application of the doctrine of constructive notice to real estate transfers. The decision in that case sheds a great deal of light on what facts must be brought to the attention of the purchaser who pays valuable consideration in order to charge him with constructive notice of his transferor’s fraud where he was in all cases innocent of any actual knowledge of the fraud. That action was brought by the beneficiaries of a will to set aside a conveyance between the executor and trustee of an estate and one Melhado (the lessee of the premises) who purchased the property at auction for $32,500 from the executor and on the next day, through a real estate agent, resold it to the defendant Mrs. Blood. The court found that there was evidence that the original sale from the estate to defendant Melhado was fraudulent and the question presented was whether Mrs. Blood was put to inquiry and chargeable with notice of the fraud at the time she purchased the property. The transaction involved the delivery of a deed from the executor to Melhado who redelivered the deed to Mrs. Blood; and at the same time, there was delivered a mortgage for $30,000 made by Melhado to another person; Mrs. Blood completed the transaction of purchase by paying cash in the sum *843 of $6,750 and by assuming the mortgage for $30,000 and that this, with the amount paid on the execution of the contract, made up the whole consideration of $40,000.
The court held that Mrs. Blood was not only a purchaser for value, but in good faith, and that the evidence did not warrant the conclusion that she knew of facts equivalent to constructive notice of the prior fraud. The court noted that several facts must be deemed to have come under her observation, i.e., the fact that Melhado was willing to cancel the lien of the property, subject to which it had been sold at auction, and that he had availed himself of the payments by her of the purchase moneys in order to complete his own purchase from the executor and that he was making a profit of $7,500 in the transaction. The court stated (p. 294): ‘ ‘ But there was nothing-in these facts, which, in reason, should have excited her suspicions as to the good faith of these parties with whom she was dealing, and have suggested some inquiry into their relations and dealings.”
The court also stated (p. 295) that: “ She was not called upon to exercise that same cool and reflective judgment, which, perhaps, when turning over all the facts in her mind deliberately, might have given rise to some doubts as to their significance and their bearing upon those interested in the result of the trustee’s sale. * * * The question is not whether Mrs. Blood could have discovered the existence of any fraud by an inquiry; but it is whether, acting as an ordinarily prudent person would have done, she was called upon, under the circumstances, to make inquiry.”
The court further stated that however strong the circumstances were militating against the good faith of Melhado and the executor, they did not warrant Mrs. Blood put on inquiry that collusion existed to defraud the beneficiaries of the trust estate. The court remarked (p, 293) that it was imposing a stricter duty upon Mrs. Blood in this case than it would in a case involving alleged defrauding of general creditors by a transferor because it was assumed for the purposes of discussion “ that the beneficiaries of this estate might be regarded as having such equitable interests in the property as to impose a stricter duty of vigilance in the case of an intending purchaser, than would be required where the parties interested were the general creditors of the grantor”. (Emphasis supplied.)
Similarly, in the case at bar, this court finds that the evidence presented is not sufficient to sustain a finding that there were sufficient facts to put plaintiffs on inquiry of the alleged fraud *844 between First Americana and Howard Park and that there were not sufficient circumstances known to the mortgagee to ‘ ‘ have excited his suspicion, and to have lead him to inquire.”
The imposition upon the mortgagee of the duty to inquire into the internal affairs of those with whom the mortgagor alone is in privity would constitute an undue burden and defendants have not proffered nor has this court found any authority to justify the creation of a special rule to cover the facts presented in this case.
With regard to defendants’ cause of action to set aside the conditional assignment of rents executed by First Americana to the Fund, this court notes that the granting of this relief would be based not on fraud, actual or constructive, but on lack of consideration. The setting aside of the assignment would, however, be a vain act, since the Fund was a good faith purchaser of the mortgage and since the record is totally barren of evidence to the effect that First Americana did actually pay rents to the Fund in diminution of the interests of the bondholders.
Nor will this court set aside the conditional assignment by First Americana to the Fund of its lease, because the lease modification between First Americana and Howard Park, which was valid as to the Fund, had the same result as that assignment.
Accordingly, judgment of foreclosure and sale is granted in favor of plaintiffs.